Argued April 15; affirmed April 28, 1936

# PERRY ET AL. *v.* GORE ET AL.
### (56 P. (2d) 1142)

*Porter J. Neff,* of Medford (Neff & Frohnmayer, of Medford, on the brief), for appellant.

*George M. Roberts,* of Medford (Wm. M. McAllister, of Medford, on the brief), for respondents.

RAND, J. This is a suit in equity to enforce a pledge alleged to have been made by the defendant, W. H. Gore, to secure the payment to the Medford National Bank of a debt then owing by him to the bank. Subsequently, the bank went into voluntary liquidation and transferred certain of its assets, including its rights as such pledgee, to the plaintiffs, who were appointed by its directors and stockholders as a liquidating committee and as trustees to convert the same into cash and apply the proceeds thereof in payment of the bank's debts and distribute the balance, if any, among the stockholders. At a still later date, W. H. Gore was adjudicated a bankrupt and the defendant, P. M. Janney, was appointed as trustee of his estate.

The cause was tried in the court below and, from a decree holding that the pledge is valid and directing that the pledged property be sold under execution to satisfy the bank's claim, the trustee has appealed.

The material facts are as follows: On August 18, 1932, W. H. Gore, the president of the Medford National Bank, was indebted to the bank in a considerable sum of money, and on that day he executed and delivered to the bank, as additional security for his indebtedness, an instrument in writing in the form of a collateral note, wherein and whereby he promised and agreed to pay to the bank on demand the sum of

$10,100 with interest thereon at the rate of 6 per cent per annum and, in the same instrument and as security for the payment thereof, he pledged to the bank and authorized the bank to sell at either private or public sale one five-karat diamond ring and two two-karat diamond earrings and 24 rugs. The ring and earrings were, on that day, delivered to the bank and placed in its vaults. Two of the pledged rugs were in the hands of a rug dealer in San Francisco for sale. As to these two rugs, he gave to the bank a written order upon the dealer to deliver them to the bank. One of these rugs has since been sold by direction of the bank and the proceeds applied in part payment of the Gore obligation. The other is still in San Francisco but held subject to the order of the bank. The remaining rugs, 22 in number, had, prior thereto, been used in furnishing the Gore home, where Mr. Gore was living with his wife, son and daughter. As stated, the instrument creating the pledge was in writing and, as written, 24 rugs were listed, but five of these had previously been given by Mr. Gore to his son and daughter and, after the instrument was executed, the bank released all claim upon its part to these five rugs. On the day the instrument in question was signed, the bank sent its attorney, Mr. George M. Roberts, to the Gore home to accept possession of the rugs for the bank and, at that time, Mr. Gore removed the remaining 17 rugs described in the pledge agreement from the floors and walls of his house, folded them up and placed them in two large cotton sacks which he had prepared for that purpose and delivered them to Mr. Roberts as the attorney for the bank, who then took possession of them for the bank, thereby consummating the pledge. These rugs were all Oriental

rugs and valuable and the bank had no place to store them and no means of protecting them from injury by moths. For that reason, it was then and there agreed that these 17 rugs and the sacks containing them should be delivered to Mrs. Gore as agent for the bank and be stored in an empty room in the Gore house. Thereupon, Mr. Roberts delivered them to Mrs. Gore, under a written agreement signed by her in which she promised to hold them in her possession as agent for the bank and to deliver them to the bank whenever requested so to do. Pursuant thereto, the rugs were taken by her and placed in an empty store-room, the door was locked and possession of the key taken by Mrs. Gore, and the rugs remained in her possession until on or about September 13, 1934, when she delivered them to the officers of the bank, who then and there took them into their possession and have ever since retained possession thereof.

It is the trustee's contention that these rugs were joint property belonging to both Mr. and Mrs. Gore and, therefore, that their delivery to Mrs. Gore, who was one of the joint owners, defeated the pledge.

There is no evidence to support the contention that Mrs. Gore owned the rugs jointly with her husband or ever had had any interest in them, although, of course, she, in common with the other members of the family, had had the use and enjoyment of them after their purchase by her husband. The whole evidence shows that, at the time the pledge was made, these rugs belonged exclusively to Mr. Gore and that Mrs. Gore neither owned nor claimed ownership of them.

■ It has also been suggested that Mrs. Gore was not a legally qualified person to act as agent for the bank because she was the wife of and living in the home

of the pledgor. The common-law disabilities of a wife have been abolished in this state by section 5 of Article XV of the constitution and by sections 33-201 to 33-215, Oregon Code 1930. Under these provisions, a married woman has the same right to contract with her husband or with third parties in respect to her own property as if she were single, and she has the power to dispose of and control her separate property the same as if she were single. Hence, her possession of the pledged property was not the possession of her husband and she could contract to hold them for the bank as fully as if she had been single: *Velten v. Carmack*, 23 Or. 282 (31 P. 658, 20 L. R. A. 101).

■ The evidence shows that during the two years while Mrs. Gore was so acting for the bank the rugs were taken on several occasions from the storeroom into the open air and removed from the sacks and treated to prevent injury from moths. It also shows that on one or two occasions at least they were removed from the sacks and examined by prospective purchasers, who had been sent to the house by the bank. These facts, it is contended, were sufficient to defeat the pledge, it being contended that since these acts were done by Mr. Gore it amounted to a surrender by the bank of its possession of the rugs. The fact that these acts were done by Mr. Gore and not by Mrs. Gore is of no importance for they were done in order to preserve the pledge and not for the purpose of defeating it and, even if they had been temporarily turned over to Mr. Gore for those purposes and he had done such acts in the absence of Mrs. Gore, they would not have been sufficient to have extinguished the pledge.

"Re-delivery to pledgee. Possession is of the very essence of the pledge, and if possession be re-delivered

by the pledgee, or with his consent, without more, the pledge is extinguished. The exceptions to the rule are where the pledgor holds as the pledgee's agent, or where the pledge is re-delivered for a temporary purpose only, e.g. for sale, or for collection or suit by the pledgor: (citing authorities). Such possession by the pledgor will not defeat the pledge." Bouvier's Law Dictionary, subject "Pledge", p. 685.

As said in 49 C. J., p. 916:

"* * * the validity of the pledge is not affected by the fact that, after delivery to a third person, the pledgor assists, with or without the knowledge of the pledgee, in taking care of the property."

Again, as said by Jones in his work on Pledges and Collateral Securities (2d Ed.), section 40:

"It is a well settled principle that a delivery back of the possession of the thing pledged terminates the pledgee's title, unless such redelivery be for a temporary purpose only, or be to the pledgor in a new character, such as special bailee, or agent."

There is, however, no contention that these rugs were ever removed from the sacks or were ever taken from the storeroom except for the temporary purposes above stated and the whole evidence shows that, after being so treated, they were immediately replaced in the sacks and in the storeroom and, at no time, were they ever used or intermingled with any of Mr. Gore's unpledged property.

■ It is also contended that, because these rugs were not taken from the dwelling-house of the pledgor and were left there in the possession of Mrs. Gore, the validity of the pledge has in some way been destroyed. We are unable to agree with this contention. As said in 49 C. J., p. 915:

"A mere setting apart of designated personalty as a pledge or as security is sufficient as between the

parties to create a lien; and, even as against third persons, where the nature of the property is such that a valid delivery may be made without removing it from the premises of the pledgor, a sufficient delivery may be made by segregating the property and placing it in the custody of a special bailee who can at all times have control over it, or by placing it in the custody of the pledgee; and as a general rule, if the property remains on the pledgor's premises, the property must be so separated and marked as to give notice of the pledgee's possession to third persons, who might deal with the pledgor.''

There is no suggestion in the record that Mr. Gore, in the making of the pledge, and the bank, in accepting it, were not acting in entire good faith. The pledge, when made, was valid and nothing has been shown to have occurred since that could, in any way, invalidate it or extinguish the lien.

It clearly appears from the evidence of the case that there is still due to the bank from Mr. Gore upon his collateral note the sum of $5,987.50 with interest thereon at the rate of 6 per cent per annum from November 13, 1934. In addition thereto, he also owes other sums to the bank. From this it will be seen that the indebtedness for which the pledge was given is still a valid and subsisting obligation of the pledgor and, since the pledge is still valid and subsisting, none of these contentions can be sustained.

■ The proceedings in bankruptcy upon which the trustee relied to defeat the pledge were first instituted by the filing by Mr. Gore of a petition for composition under the Frazier-Lempke Act on August 31, 1934, and later, and on November 10, 1934, he filed a petition in bankruptcy and on the same day was adjudicated a bankrupt. From this, it will be seen that more than two

years had elapsed after the making of the pledge before the first proceedings in bankruptcy were instituted, and, since the pledge is a valid pledge, the trustee in bankruptcy is in no position to complain.

For these reasons, the judgment of the lower court will be affirmed.

CAMPBELL, C. J., and BEAN and BAILEY, JJ., concur.